IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ANTHONY APANOVICH, *et al.*,

        Plaintiffs,

    vs.                      Civil Action 2:05-CV-1015

                                  Magistrate Judge King

REGINALD A. WILKINSON, *et al.*,

        Defendants.

## OPINION AND ORDER

This is a civil rights action under 42 U.S.C. § 1983, in which plaintiffs, Anthony Apanovich ("Apanovich"), an inmate on Ohio's death row,[1] Cindy Mollick, an individual who plans to attend Apanovich's execution, Ohio Stop Offenders Rehabilitate & Treat, Inc. ("SORT"), a non-profit organization, and Cleveland Challenger, a biweekly newspaper, allege that Ohio's procedures in connection with executions violate the constitutional rights of the public and press to observe an execution and of the condemned to have his counsel present and his execution "fully observed."

With the consent of the parties, 28 U.S.C. § 636(c), this matter is now before the Court on *Defendants' Motion for Summary Judgment*, Doc. No. 29 ("*Defendants' Motion*") and plaintiffs' *Motion for Leave to File Amended Complaint*, Doc. No. 39 ("*Plaintiffs' Motion*"). The Court will address each motion in turn.

I.    FACTS AND PROCEDURAL HISTORY

    A.    Execution Process in Ohio

The sole method of execution in the State of Ohio is lethal

---

[1]On July 21, 2006, the Court dismissed the claims of Anthony Apanovich without prejudice for failure to exhaust administrative remedies. Doc. No. 18.

injection, a process that involves several steps. *Amended Complaint*, ¶¶ 18-19 (citing Department of Rehabilitation and Correction ("DRC") Policy 01-009). Prior to entering the execution chamber, devices acting as intravenous shunts are inserted in the condemned inmate's veins. *Id*. at ¶ 20. During the execution, these shunts will be connected to catheters that carry the lethal combination of chemicals, composed of three agents. *Id*. at ¶¶ 20-22.

Next, the condemned inmate is escorted from his cell to the execution chamber. *Id*. at ¶ 21. Once inside the execution chamber, the inmate is strapped to a gurney and DRC personnel install the catheters that will pass the lethal chemicals into the inmate's body. *Id*. at ¶¶ 20-21. The warden reads the death warrant and permits the inmate to speak final words. *Id*. at ¶ 21. Next, the execution team inserts intravenous tubes into the inmate's shunts. *Id*. At the warden's signal, the lethal chemicals travel into the condemned prisoner. *Id*. at ¶ 21.

## B. Witnesses Permitted to View Ohio Executions

Ohio law requires the Director of DRC, currently Terry J. Collins,[2] to "authorize at least one representative of a newspaper, at least one representative of a television station, and at least one representative of a radio station to be present at the execution of the sentence under division (A)(7) of this section."[3] O.R.C. §

---

[2]Plaintiffs move to substitute Defendant Collins for Defendant Reginald Wilkinson. *Plaintiffs' Motion*, p. 1. The Court will address this request, and plaintiffs' other requests to amend, *infra*.

[3]O.R.C. § 2949.25(A)(7) provides that "[r]epresentatives of the news media as authorized by the director of rehabilitation and correction" may be present at the execution of a death sentence.

2

2949.25(B); *Amended Complaint*, ¶ 29.

In addition to these media witnesses, only the following persons may be present at an execution:

> (1) The warden of the state correctional institution in which the sentence is executed or a deputy warden, any other person selected by the director of rehabilitation and correction to ensure that the death sentence is executed, any persons necessary to execute the death sentence by lethal injection, and the number of correction officers that the warden thinks necessary;

> (2) The sheriff of the county in which the prisoner was tried and convicted;

> (3) The director of rehabilitation and correction, or the director's agent;

> (4) Physicians of the state correctional institution in which the sentence is executed;

> (5) The clergyperson in attendance upon the prisoner, and not more than three other persons, to be designated by the prisoner, who are not confined in any state institution;

> (6) Not more than three persons to be designated by the immediate family of the victim;

> (7) Representatives of the news media as authorized by the director of rehabilitation and correction.

O.R.C. § 2949.25(A). The prosecutor from the county where the condemned inmate was tried and convicted may also attend the execution. *Amended Complaint*, ¶ 31.

**C. What Witnesses May See When Observing Executions**

In five of eight executions conducted prior to January 2004, witnesses to an execution did not hear or see the following events: (1) DRC personnel connecting monitoring equipment to the inmate, *Amended Complaint*, ¶ 23; (2) DRC personnel placing the inmate in restraints, *id.*; (3) the insertion of shunts or tubes into the inmate, *id.*; (4) the inmate stepping into the execution chamber, *id.* at ¶ 24;

3

and (5) the actions involved in declaring the inmate officially dead, *id*.

In November 2004, defendants installed a closed circuit camera, permitting witnesses to see, but not hear, the installation of the shunts into the inmate. *Id*. at ¶¶ 25, 37. The witnesses viewed this image on a small screen in the witness viewing room. *Id*. at ¶ 37.

During the execution of Joseph Clark on May 2, 2006, a curtain was drawn, preventing witnesses from viewing the efforts of the execution team to carry out the execution. *Id*. at ¶ 39. After this execution, Director Collins stated to the media that he may order that the curtain be drawn under certain circumstances in future executions. *Id*. at ¶ 40.

### D. Plaintiffs' First Lawsuit

On September 25, 2003, plaintiffs filed a complaint alleging that Ohio's procedures in connection with executions violated the constitutional rights of the public, press and condemned inmate. *See Complaint*, Doc. No. 1, *Apanovich v. Taft*, Case No. 2:03-cv-00874. On November 17, 2004, the parties stipulated to the dismissal of the action without prejudice. Doc. No. 42.

### E. The Instant Litigation

Plaintiffs filed the instant action on November 9, 2005. Doc. No. 1.[4] Apanovich is a prison inmate in custody of the DRC on Ohio Death Row at the Ohio State Penitentiary in Youngstown, Ohio. *Amended Complaint*, ¶ 4. No execution date has been set, but plaintiffs

---

[4]Although Doc. No. 1 was the original *Complaint* filed in this lawsuit, this document is entitled, curiously, "***Second Amended Complaint** for Declaratory and Injunctive Relief, Attorney Fees & Costs Pursuant to 42 USC §1983 and 42 USC §1988(b)*" (emphasis added).

4

anticipate that his death sentence will be "imposed upon him at the earliest possible date." *Id*. Plaintiffs allege that Ohio's procedures in connection with executions violate the media's First Amendment rights; violate Apanovich's constitutional right to be executed publicly and to have his execution viewed in its entirety; violate the Due Process Clause of the Fourteenth Amendment; violate Apanovich's Sixth Amendment right to a public trial and right to counsel; and violate the Fourteenth Amendment's right to equal protection. *Id*. at ¶¶ 51-87.

Defendants moved to dismiss the *Complaint*. Doc. No. 5. On July 14, 2006, plaintiffs filed an *Amended Complaint*, which added no new substantive allegations. Doc. No. 16. After full briefing on defendants' motion to dismiss, the Court dismissed the claims of Apanovich, without prejudice, for failure to exhaust administrative remedies, but denied defendants' motion to dismiss as to the claims of the other plaintiffs. Doc. No. 18.

After dismissal of Apanovich's claims, defendants answered the *Amended Complaint* and then filed a motion for summary judgment. Doc. No. 29. Plaintiffs filed a memorandum opposing *Defendants' Motion*. *Plaintiff's* [sic] *Response Opposing Defendants' Motion for Summary Judgment*, Doc. No. 38 ("*Plaintiffs' Opposition*"). Defendants did not file a reply memorandum in support of their motion.

Thereafter, plaintiffs filed a motion for leave to file an amended complaint. *Plaintiffs' Motion*. The Court will consider the pending motions in turn.

## II. PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

## A.    Background

Plaintiffs seek leave to "amend their Second Amended Complaint, filed on November 9, 2005[.]" *Plaintiffs' Motion*, p. 1.  Plaintiffs state that they seek to amend for the purposes of:

(1)    including an additional Plaintiff,

(2)    substituting Terry J. Collins for Defendant Reginald Wilkinson as Wilkinson no longer works at the Ohio Department of Rehabilitation and Corrections, and Collins has taken his place as Director,

(3)    adjusting certain other allegations to reflect events that have occurred since the prior version of the complaint, and

(4)    eliminating claims on behalf of former plaintiff Anthony Apanovich.

*Id*.

More particularly, plaintiffs seek to add Kevin Osborne, a staff writer with the Cincinnati City Beat, a weekly print media organization, as a plaintiff.  *Id*. at 2.  Plaintiffs argue that the addition of this plaintiff "will not change the issues heretofore raised in this lawsuit or those addressed in" *Defendants' Motion*.  *Id*. Plaintiffs also seek to update the number of executions in Ohio (26 executions instead of 18 executions) and to add details regarding the execution of Joe Clark on May 2, 2006.  *Id*. at 3.

Defendants have not filed an opposition brief to *Plaintiffs' Motion*.

## B.    Standard

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2) (2007).  The grant or denial of a

request to amend a complaint is left to the broad discretion of the trial court. *Gen'l Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990). In exercising its discretion, the trial court may consider such factors as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

   **C. Discussion**

   *Plaintiffs' Motion* and proposed *Second Amended Complaint for Declaratory and Injunctive Relief, Attorney Fees & Costs Pursuant to 42 USC §1983 and 42 USC §1988(b)*, attached to *Plaintiffs' Motion*, are confusing and deficient in several respects. First, plaintiffs seek leave "to amend their Second Amended Complaint, filed on November 9, 2005[.]" *Plaintiffs' Motion*, p. 1. (Throughout *Plaintiffs' Motion*, plaintiffs also state that they seek leave to amend "Plaintiffs' First Amended Complaint" and "the Complaint." *Id.* at 2-3.) However, as discussed *supra*, plaintiffs previously filed a more recent complaint, the *Amended Complaint*, on July 14, 2006, Doc. No. 16. (Defendants have moved for summary judgment on the claims asserted in Doc. No. 16. *See, e.g.*, *Defendants' Motion*, p. 4.) Therefore, it is unclear whether plaintiffs intend to seek leave to amend Doc. No. 16 and mistakenly referred to Doc. No. 1, or if plaintiffs considered only the allegations contained in Doc. No. 1 when moving for leave to amend.

   Second, plaintiffs state that they seek only to eliminate the

7

claims of Apanovich, but the proposed *Second Amended Complaint*
purports to eliminate much more than his claims. Specifically, the
proposed *Second Amended Complaint* asserts only one cause of action,
the media's First Amendment right of access to governmental
proceedings. *See Second Amended Complaint*, ¶¶ 41-52. However,
plaintiffs have not previously disputed defendants' characterization
that plaintiffs alleged *two* claims, *i.e.,* the media's First Amendment
claim and a claim based on alleged violation of the Due Process Clause
of the Fourteenth Amendment. *See Defendants' Motion*, p. 5;
*Plaintiffs' Opposition*. Accordingly, it is unclear whether plaintiffs
now intend to withdraw all claims except the media's First Amendment
claim or if they intend to assert more than one claim.

Third, the prayer for relief in the proposed *Second Amended
Complaint* further obscures exactly how plaintiffs intend to proceed.
*See Second Amended Complaint*, p. 15. Plaintiffs seek relief against
defendants for violation of "the First, Eighth and Sixth Amendments to
the United States Constitution as well as the Constitution's Due
Process Clause, as incorporated by the Fourteenth Amendment to the
United States Constitution[.]" *Id*. As discussed *supra*, the proposed
*Second Amended Complaint* alleges only a claim under the First
Amendment. *See Second Amended Complaint*, ¶¶ 41-52. Again, the Court
cannot discern from plaintiffs' submissions what relief they seek.

Finally, plaintiffs seek to add a new plaintiff, an individual
from a media organization, and simply contend that the addition of
this plaintiff does not change the issues as asserted in the lawsuit
or as briefed in *Defendants' Motion*. *Plaintiffs' Motion*, p. 2.

8

However, as discussed in more detail *infra*, defendants previously attacked the standing of the media plaintiffs. *Defendants' Motion*, p. 9. Based on plaintiffs' submissions, it is unclear whether the standing of this new plaintiff will be the subject of challenge by defendants as well.

Accordingly, under these circumstances, the Court concludes that plaintiffs' *Motion for Leave to File Amended Complaint*, Doc. No. 39, should be **DENIED** at this time. However, in light of the liberal standard to amend under Fed. R. Civ. P. 15(a)(2), the Court will give the plaintiffs a renewed opportunity to amend their *Amended Complaint*. Plaintiffs are **DIRECTED** to file, within fourteen (14) days from the date of this *Opinion and Order*, a revised motion for leave to amend and revised second amended complaint, specifically addressing the ambiguities and deficiencies discussed *supra*.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Background

Defendants contend that only two claims (not unique to Apanovich) survive the Court's previous *Opinion and Order*, Doc. No. 18: the alleged violation of the media's First Amendment right of access to governmental proceedings and the alleged violation of plaintiffs' Fourteenth Amendment right to due process of law. *Defendants' Motion*, p. 9. As discussed *supra*, plaintiffs do not disagree with defendants' characterization of plaintiffs' surviving claims. *See*, *generally*, *Plaintiffs' Opposition*.

In moving for summary judgment, defendants raise three general arguments. *Defendants' Motion*, p. 5.

### 1. Standing

9

First, defendants argue that plaintiffs Cindy Mollick ("Mollick"), SORT and "the Challenger"[5] lack standing under Article III, section 2 of the United States Constitution.  *Id.* at 5, 7-9. According to defendants, Mollick lacks standing for two reasons. Defendants contend that developments in Apanovich's federal habeas case suggest that Apanovich "is certainly several years away from an execution date[,]" if the execution occurs at all.  *Id.* at 7-8.  In addition, defendants argue that it is uncertain whether Apanovich will ultimately select Mollick to witness his execution as the condemned inmate does not submit his list of designated witnesses until seven days before the scheduled execution.  *Id.* at 8 (citing DRC Policy 01-COM-11(V)(B)(2)(a),[6] attached to *Defendants' Motion*).  Defendants further contend that the Cleveland Challenger lacks standing because it does "not qualify as a media representative because priority is given to the newspapers with the widest daily circulation, a criterion that the Challenger does not meet."  *Id.* at 9 (citing *Dean Aff.*, ¶ 6).[7]

---

[5]For clarification, the *Amended Complaint* refers to "the Challenger" as a quarterly newsletter published by SORT.  *Amended Complaint*, ¶ 6.  Defendants address the standing of "the Challenger," but apparently intend to refer to plaintiff "Cleveland Challenger" (as opposed to SORT's quarterly newsletter), which is a corporation organized under the laws of the State of Ohio for the purpose of generating a biweekly newsletter.  *Defendants' Motion*, p. 9; *Affidavit of Andrea Dean* ("*Dean Aff.*"), ¶ 6, attached to *Defendants' Motion*; *Amended Complaint*, ¶ 7.

[6]Defendants refer to DRC Policy 01-COM-11(V)(B)(2)(a), but the correct citation is DRC Policy 01-COM-11(VI)(B)(2)(a).

[7]The *Dean Affidavit* avers that "[p]ursuant to the criteria set forth in the Media Policy, the Cleveland Challenger would not be selected to witness an execution, although they would be permitted to come into the institution on the day of execution and hear the eyewitness briefings in the media center." *Dean Aff.*, ¶ 6.

The "Media Policy" referred to in this affidavit is attached thereto and provides, in pertinent part, that "Additional Media Witnesses" will be selected in the following manner:

Other than referring to SORT in the section heading, defendants do not specifically address the standing of SORT. *Id.*

In response, plaintiffs first argue that defendants have taken inconsistent positions on this issue. *Plaintiffs' Opposition*, p. 5. Specifically, defendants previously argued in this case and in another case that the inmate's challenge to execution protocol was barred by the statute of limitations and that the inmate's cause of action would not accrue until after execution. *Id.*

Plaintiffs next contend that developments in Apanovich's criminal or habeas proceedings do not affect plaintiffs' standing because "it is not a foregone conclusion" that Apanovich will be granted relief and will not be executed. *Id.* at 6.

As to Mollick's standing, plaintiffs contend that defendants' argument (*i.e.,* that Apanovich can change his mind about Mollick as his witness) effectively prevents any witness from ever having standing. *Id.* at 6-7. Plaintiffs also argue that defendants' position would similarly prevent pool news reporters from witnessing an execution because they are not advised until 72 hours before an execution that they have been selected as witnesses. *Id.* at 7. Plaintiffs contend that their right of access to governmental proceedings outweighs defendants' arguments, especially where

---

A reporter from the newspaper with the largest daily circulation in the inmate's county of commitment. A reporter from the newspaper with the largest circulation in the closest large metropolitan area to the county of commitment. (In the case of Cincinnati, both the *Post* and the *Enquirer* will be allowed media witnesses). An Associated Press (AP) reporter selected by the AP in Columbus.

DRC Policy 01-COM-09(VI)(E)(7)(b)(ii).

defendants have no information that Apanovich has changed his mind about Mollick. *Id*.

As to the standing of SORT and the Cleveland Challenger, plaintiffs argue that DRC's "Media Policy" (DRC Policy 01-COM-09(VI)(E)(7)(b)(ii)) limits the type of media witnesses present at an execution, but O.R.C. § 2949.25, *supra*, does not. *Id*. Plaintiffs therefore contend that the Media Policy circumvents and improperly limits O.R.C. § 2949.25. *Id*. at 7-8.

### 2. Whether a constitutional right to witness an execution exists

Second, defendants argue that plaintiffs' claims are actually based on state -- not federal -- law because there is no general federal constitutional right to witness an execution. *Defendants' Motion*, pp. 9-10. Defendants contend that the alleged state violations fail to state a constitutional claim under 42 U.S.C. § 1983 and that this Court lacks subject matter jurisdiction over plaintiffs' claims. *Id*. at 9-10. In making this argument, defendants acknowledge that at least one court, the United States Court of Appeals for the Ninth Circuit, has found a federal constitutional basis for a Section 1983 action challenging California's state statute governing witnesses to executions. *Id*. at 10 (citing *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002)). Defendants simply state: "We respectfully disagree and urge the Court not to follow it [*Woodford*] and instead find that *Holden v. Minnesota*, 137 U.S. 483 (1890), confirms that there is no constitutional right to witness executions." *Id*.

In response, plaintiffs argue that "[a] community that permits

12

its government to convict, condemn and carry out this irrevocable punishment must be kept abreast of developments related to it." *Plaintiffs' Opposition*, p. 8. Plaintiffs contend that the United States Supreme Court has recognized a First Amendment right to attend and witness public proceedings, such as executions. *Id.* at 9 (citing *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980)). According to plaintiffs, the purpose of the right of access under the First Amendment is "[t]o ensure that [the] constitutionally protected 'discussion of government affairs' is an informed one." *Id.* (quoting *Globe Newspaper v. Superior Court*, 457 U.S. 596, 605 (1982)).

Plaintiffs assert that the public has a right of access "(1) where the governmental proceeding in question 'historically has been open to the press and the general public'; and (2) where the access 'plays a particularly significant role in the functioning of the judicial process and the government as a whole.'" *Id.* at 9 (quoting *Globe Newspapers Co. v. Superior Court*, 457 U.S. 596, 605-06 (1982)).

Plaintiffs rely on *Woodford*, which addressed California's practice of drawing a curtain during portions of lethal injection executions. *Id.* at 10. Plaintiffs note that *Woodford* "upheld the media plaintiffs' claim to a First Amendment right of access against the prison's competing interests." *Id.* at 11. Plaintiffs argue that Ohio requires media witnesses because they provide the public with information necessary to monitor a critical government function. *Id.* at 11-12.

According to plaintiffs, executions have historically been open to the press and general public; plaintiffs take the position that the public should be able to observe executions even when mistakes occur.

13

*Id*. at 9-10, 12-13 (citing John D. Bessler, *Televised Executions and the Constitution: Recognizing a First Amendment Right of Access to State Executions*, 45 Fed. Comm. L.J. 355, 359-64 (1993)). Plaintiffs contend that the last "town square" execution occurred in 1858 in Missouri. *Id*. at 12. Plaintiffs contend that states enacted laws to ensure public access to executions once executions moved inside prisons. *Id*. Every state authorizing the death penalty requires media witnesses to be present; Ohio requires three media witnesses and California invites seventeen media witnesses. *Id*.

Plaintiffs further argue that witnesses historically viewed executions "from beginning to end[,]" viewing a hanging from the inmate's ascent up the gallows and fall through the trap door. *Id*. Plaintiffs observe that the Ninth Circuit concluded that historical tradition supports the witnesses' First Amendment right to view guards escorting an inmate into the execution chamber, strapping the inmate to the gurney and inserting intravenous lines. *Id*. at 12-13 (citing *Woodford*, 299 F3d at 876).

### 3. Constitutionality of Ohio's execution policies

#### a. Defendants' position

Defendants argue that, even assuming standing and colorable claims, Ohio's execution policies are constitutional. *Defendants' Motion*, pp. 5, 10-12. Defendants contend that there are only three events in the execution process that the witnesses in Ohio do not see: "(1) there is no viewing of the inmate walking from the holding cell into the execution chamber; (2) in the [Joe] Clark execution the curtains were closed when problems developed with a 'blown vein'; and

14

(3) the curtains are closed while the doctor pronounces death." *Id.* at 10.  According to defendants, there is no constitutional right to witness these events and defendants have a "legitimate penological reason for the three types of closure." *Id.*

In justifying the first type of closure, defendants argue that the inmate's walk from the holding cell into the execution chamber "is not even part of the execution." *Id.*  Defendants offer two arguments in support of this position: (1) to hold otherwise could lead to unacceptable conclusions: *e.g.,* if the Court considers this walk part of the execution process, then the process could logically cover the drive from Youngstown, Ohio, to Lucasville, Ohio; and (2) *Woodford*, which defendants previously rejected, considers "the beginning of the execution process as entry into the execution chamber." *Id.* at 10-11 (citing *Woodford*, 299 F.3d at 876).

Next, defendants argue that the second type of closure (in emergency situations such as a "blown vein") serves three legitimate penological goals: (1) emergency procedures increase staff members' exposure to witnesses, heightening staff's fears of identification and possible witness retribution; (2) an audience during an emergency procedure places unnecessary external pressure on staff and may result in staff members' resignation; and (3) staff members fear that their reactions in emergency procedures may be misconstrued and be held against them.  *Id.* at 11 (citing *Affidavit of Edwin C. Voorhies, Jr., Warden* ("*Voorhies Aff.*"), ¶¶ 8, 9 and 12, attached to *Defendants' Motion*).

Defendants assert that the third type of closure (during the doctor's confirmation of death) is not a part of the execution

15

process. *Id.* Defendants also argue that the closure at this stage also serves the legitimate penological interest of protecting the doctor who confirms the inmate's death. *Id.* at 11-12. Defendants contend that the doctor could face retribution from the American Medical Association, which would cause the doctor to resign from his position in the execution process. *Id.* at 12 (citing *Voorhies Aff.*, ¶ 10).

Finally, defendants contend that DRC has never made an exception to the statutory witness requirements. *Id.* (citing *Affidavit of Karen Ho, DRC Director of Office of Victim Services* ("*Ho Aff.*"), attached to *Defendants' Motion*.

   **b.   Plaintiffs' position**

In response, plaintiffs disagree with defendants' characterization that the permissible view of the execution process is restricted in only three situations. *Plaintiffs' Opposition*, pp. 13-14. Plaintiffs first dispute the affidavits of Mr. Voorhies and Ms. Ho regarding the location of the camera (allegedly located on the ceiling of the inmate's holding cell) and averments that the camera position has not changed. *Id.* at 14-15. Plaintiffs specifically assert that, after the execution of Lewis Williams in January 2004, "DRC agents complained publicly about the camera's placement and at John Roe's execution, the process changed." *Id.* at 15 (citing article dated January 15, 2004, at toledoblade.com; *Affidavit of Ruth Tkacz, Assistant State Public Defender* ("*Tkacz Aff.*"), attached to *Plaintiffs' Opposition*). Plaintiffs contend that the camera was originally placed in the ceiling of another room adjacent to the

16

execution chamber and that the camera and camera angle have changed
since the initial placement.  *Id.* (citing *Tkacz Aff.*).  Ms. Tkacz
averred that the camera was not directly above the inmate and that she
could not see John Roe's face when she witnessed his execution.  *Id.*
(citing *Tkacz Aff.*).  Plaintiffs further assert that the camera was
not used at all during the execution of Glenn Benner in February 2006
and that his attorney, Kathleen McGarry, a designated witness, was
unable to see the insertion of the shunts.  *Id.* (citing *Affidavit of
Kathleen McGarry* ("*McGarry Aff.*"), attached to *Plaintiffs'
Opposition*).

Plaintiffs next dispute defendants' contention that blocking the
view during emergency situations, *e.g.,* during the execution of Joseph
Clark, serves legitimate penological goals.  *Id.* at 16.  Plaintiffs
argue that courts must use the four-factor balancing test articulated
in *Turner v. Safley*, 482 U.S. 78 (1987), to determine whether an
alleged constitutional right outweighs a purported legitimate
penological interest.  *Id.*  These four factors are:

>    (1) whether there is a valid, rational connection between
>    the prison regulation and the legitimate governmental
>    interest put forward to justify it;
>
>    (2) whether there are alternative means of exercising the
>    right that remain open to prison inmates;
>
>    (3) what impact accommodation of the asserted constitutional
>    right will have on guards and other inmates, and on the
>    allocation of prison resources generally and
>
>    (4) whether there exist ready alternatives that fully
>    accommodate the prisoner's rights at *de minimis* cost to
>    valid penological interests.

*Id.* at 17 (quoting *Turner*, 482 U.S. at 89-91).

Plaintiffs initially contend that defendants have failed to

17

identify a legitimate purpose or interest in concealing information
from the public during an execution. *Id*. Plaintiffs question the
stated privacy and safety concerns expressed in the *Voorhies
Affidavit*, characterizing such concerns as speculative and the
execution policy as discretionary. *Id.* at 18 (quoting *Voorhies Aff*. ¶
9, which provides, in pertinent part, that "[t]here is no way to
determine how victim and family witnesses may react in such [exigent]
situations"). Plaintiffs contend that the Ohio General Assembly
"exempted correctional employees' personal and familial information
under public record law." *Id*. Plaintiffs also argue that there are
additional, less restrictive, ways to address these speculative
concerns, such as providing staff with facial coverings or disguises.
*Id*.

As to defendants' argument that an audience creates additional
pressure on staff attempting the difficult task of inserting needles,
plaintiffs contend that the public should be able to view the
insertion for the very reason that the insertion is difficult. *Id*. at
18-19. Plaintiffs cite, by way of example, speculation in a news
article that condemned inmate Joseph Clark may not have suffered from
a "blown vein," but that, instead, improperly trained staff may have
improperly inserted catheters into Mr. Clark. *Id*. at 19 (citing
article dated May 3, 2006, at toledoblade.com). Plaintiffs further
state that Dorian Hall, a social worker and investigator with the Ohio
Public Defender's Office, witnessed Mr. Clark's May 2, 2006, execution
and reported that the curtains were drawn for approximately thirty
minutes, during which time she heard Mr. Clark moan and groan. *Id*.
(citing *Affidavit of Dorian Hall* ("*Hall Aff*."), attached to

18

*Plaintiffs' Opposition*).

Defendants filed no reply addressing the arguments raised in *Plaintiffs' Opposition*.

**B.    Standard**

The standard for summary judgment is well established.  This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which  provides in pertinent part:

> The judgment sought shall be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c)(2007).  Pursuant to Rule 56(c), summary judgment is appropriate if "there is no genuine issue as to any material fact . . . ." *Id*.  In making this determination, the evidence "must be viewed in the light most favorable" to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, summary judgment is appropriate if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The "mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

19

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). "Once the moving party has proved that no material facts exist, the non-moving party must do more than raise a metaphysical or conjectural doubt about issues requiring resolution at trial." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### C.   Discussion

####   1.   Developments since *Defendants' Motion* was filed

#####     a.   *Baze v. Rees*, 128 S.Ct. 34 (Sept. 25, 2007)

Subsequent to the filing of *Defendants' Motion* and *Plaintiffs' Opposition*, the United States Supreme Court granted *certiorari* in *Baze v. Rees*, 217 S.W.3d 207 (Ky. 2006). *See Baze v. Rees*, 128 S.Ct. 34 (2007). *Baze* presents a challenge to the constitutionality of Kentucky's lethal injection protocols and takes the position that the protocols violate inmates' Eighth Amendment rights to be free from cruel and unusual punishment. *Baze*, 217 S.W.3d at 209. In briefing this matter before the Supreme Court, Appellant Petitioner discussed difficulties presented during the Ohio execution of Joseph Clark,

20

specifically noting that execution team members closed the curtains during the execution process.  Initial Brief of Appellant-Petitioner at 22, *Baze v. Rees*, No. 07-5439, 2007 U.S. Briefs 5439 (U.S. Nov. 5, 2007).

*Amici* also filed briefs in *Baze*, suggesting that the Supreme Court take into account executions in Ohio and the secrecy surrounding executions in general in the United States.  *See* Amicus Brief of The American Civil Liberties Union at 6-30, No. 07-5439, 2007 U.S. Briefs 5439 (U.S. Nov. 8, 2007); Amicus Brief of The Louis Stein Center for Law and Ethics at 33-39, No. 07-5439, 2007 U.S. Briefs 5439 (U.S. Nov. 13, 2007).  More specifically, The American Civil Liberties Union ("ACLU") argues in *Baze* that lethal injection procedures are "shrouded in secrecy" and that "witnesses are prevented from seeing all that is occurring.  Sometimes curtains physically block the witnesses' view of the inmate and sometimes the physical layout of the execution chambers makes it impossible for the witnesses to know what the state is injecting, who is injecting it, and how quickly it is being injected."  Amicus Brief of ACLU at 3-4.  The ACLU contends that what witnesses are permitted to see is left entirely to the discretion of the warden and correction officials and that drawn curtains prevent witnesses from observing botched executions.  *Id.* at 19-22 ("Ohio executioners failed to maintain the required dual intravenous access lines.").  The ACLU explains that "[t]ransparency in government is a critical aspect of our democracy, and it helps ensure that public policy accords with contemporary values and civilized standards of decency."  *Id.* at 4.

Similarly, The Louis Stein Center for Law and Ethics ("Louis Stein Center") contends that states repress "public scrutiny of the

[lethal injection] procedure and its implementation." Amicus Brief of Louis Stein Center at 34. "States' efforts to conceal execution procedures include restricting witnesses to viewing only limited portions of the process." *Id*. at 35. Louis Stein Center argues that secrecy surrounding lethal injection protocols frustrates attempts to evaluate such protocols. *Id*.

The secrecy arguments and the specific reference to executions in Ohio raised in the briefs of the *Baze amici* strongly resemble the arguments raised by the plaintiffs in this action. *See*, *e.g.*, *Plaintiffs' Opposition*, pp. 8-13, 19. Therefore, in ruling on *Baze*, the Supreme Court may take into consideration the alleged secrecy surrounding state lethal injection protocols. Under these circumstances, and considering the possible further amendments to the complaint, this Court concludes that *Defendants' Motion* must be **DENIED** without prejudice to renewal.

If a renewed dispositive motion is filed, the Court invites the parties to specifically address the impact, if any, that *Baze* may have on the disposition of this action.

      **b.** ***Apanovitch[8] v. Tate*, Case No. 1:91-cv-221, United States District Court for the Northern District of Ohio**

In their memoranda in support of or in opposition to the motion for summary judgment, all parties refer to Apanovich's habeas case currently pending in the United States District Court for the Northern District of Ohio. Therefore, in addition to addressing the impact of

---

[8]The Court notes that the docket in the United States District Court for the Northern District of Ohio spells this plaintiff's name "Apanovitch," while his name appears as "Apanovich" on this Court's docket.

*Baze*, the Court suggests that any renewed dispositive motion should include discussion of the current status of Apanovich's federal habeas case and its impact, if any, on the instant action.

### c. *State v. Rivera,* Case No. 04cr065940, Court of Common Pleas for Lorain County

The Court of Common Pleas for Lorain County will consider the constitutionality of Ohio's lethal injection protocols as cruel and unusual punishment under the Eighth Amendment to the United States Constitution. *See State v. Rivera*, Case No. 04cr065940, Docket Entry dated May 24, 2007. An additional evidentiary hearing in that case is set for April 7, 2008. *See* Docket Entry dated January 9, 2008. Should a renewed dispositive motion be filed in the instant case, this Court would find helpful discussion regarding the impact, if any, that a determination in *Rivera* might have on this case.

### 2. Additional issues

Plaintiffs raise certain issues in their opposition to defendants' motion for summary judgment that defendants may usefully address in a renewed dispositive motion. For example, plaintiffs argue that SORT and Cleveland Challenger have standing to challenge DRC's Media Policy. Plaintiffs also argue that there exists a First Amendment right to witness executions, citing *Richmond Newspapers*, 448 U.S. 555; *Globe Newspaper*, 457 U.S. 596; *Woodford*, 299 F.3d 868. Plaintiffs also assert that defendants have changed the camera angles since the original installation of cameras in 2004, contesting defendants' representation that witnesses' view was limited in only three ways. Finally, in challenging defendants' restrictions on what witnesses may observe, plaintiffs contend that witnesses' constitutional rights outweigh any alleged legitimate penological

23

interest under the test articulated in *Turner v. Safley*, 482 U.S. 78. Defendants did not file a reply memorandum in support of *Defendants' Motion*, and have therefore not addressed these contentions. Accordingly, any renewed dispositive motion should include discussion of these issues, including analysis of the relevant cases and arguments properly supported by legal authority.

   **WHEREUPON** plaintiffs' *Motion for Leave to File Amended Complaint*, Doc. No. 39, is **DENIED**.  Plaintiffs are **DIRECTED** to file, within fourteen (14) days of the date of this *Opinion and Order*, an amended motion for leave to file and a revised Second Amended Complaint, addressing the deficiencies and ambiguities discussed *supra*.

   Furthermore, *Defendants' Motion for Summary Judgment*, Doc. No. 29, is **DENIED** without prejudice to renewal.  Should a renewed dispositive motion be filed, the parties may usefully address the impact, if any, of the following on the outcome of this case: (1) the secrecy arguments raised by *amici* in *Baze v. Rees*, 128 S.Ct. 34 (2007); (2) the status of *Apanovitch v. Tate*, Case No. 1:91-cv-221 (N.D. Ohio); (3) *State v. Rivera*, Case No. 04cr065940; and (4) the issues raised in plaintiffs' opposition to defendants' motion for summary judgment, discussed *supra*.


March 26, 2008                       *s/Norah McCann King*
                                     Norah M$^c$Cann King
                           United States Magistrate Judge


24